UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X

OLVIN OLIVERAS,

                          Plaintiff,                    **MEMORANDUM & ORDER**

          -against-                                     **14-CV-3062 (NGG)**

CAROLYN W. COLVIN,
Acting Commissioner of Social Security

                          Defendant.
----------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Olvin Oliveras brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c),

seeking judicial review of the decision of the Social Security Administration (the "SSA") that he

is not disabled and, therefore, does not qualify for Supplemental Security Income ("SSI")

benefits. Plaintiff argues that the SSA committed four errors in denying him the benefits when

it: (1) incorrectly weighed the medical evidence; (2) failed to develop the record; (3) improperly

refused to consider new evidence; and (4) erred in assessing Plaintiff's credibility. Plaintiff has

moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), and

Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security (the

"Commissioner"), has filed a cross-motion for the same. (See Pl.'s Not. of Mot. (Dkt. 23);

Def.'s Not. of Mot. (Dkt. 25).) For the reasons set forth below, Plaintiff's motion is GRANTED,

the Commissioner's motion is DENIED, and this case is REMANDED to the SSA for further

proceedings consistent with this Memorandum and Order.

## I.    BACKGROUND

Plaintiff was born on March 23, 1964. (See Administrative R. ("R.") (Dkt. 6) at 98.) He

earned a General Education Diploma in 1989, his highest level of education. (Id. at 103.)

Plaintiff stated he had never worked before (id. at 102), but he also testified that he was last

employed in 1991, performing deliveries for his uncle in Puerto Rico (id. at 34). Plaintiff alleges that he was disabled due to a deformed right hand, spinal problems, hepatitis C, and psychiatric problems. (Id.) His conditions became severe enough to preclude him from gainful employment on June 1, 2010. (Id. at 102.)

## A. Medical Evidence Submitted to the Administrative Law Judge

### 1. Healthcare Associates in Medicine, P.C.

On March 17, 2008, Plaintiff began treatment at Healthcare Associates in Medicine with an initial physical examination completed by Dr. Glenn Babus ("Dr. Babus"). (See id. at 185-87.) Plaintiff complained of pain in the low back, mid back, right groin, and right leg. (Id. at 188.) He indicated that the pain was always present with varying intensity. (Id. at 189.) Plaintiff stated that the pain felt worse while sitting or walking, but better while standing. (Id.) He first noticed the pain in August 2007, and he began seeing a doctor for the pain in December 2007. (Id. at 190.) Plaintiff indicated that the pain had significantly interfered with his general activity, normal work routine, and appetite. (Id. at 192.) The pain mildly interfered with his social activity, sleep, enjoyment of life, and ability to concentrate. (Id.) Dr. Babus's initial physical examination revealed moderate decreased range of motion with pain in the thoracic, lower thoracic, and lumbar paravertebral areas of the back. (Id. at 186.) Dr. Babus's treatment plan included referrals for magnetic resonance imaging ("MRI") and electromyography ("EMG") to determine the presence of lumbar disc displacement and nerve root involvement. (Id.)

On March 24, 2008, Plaintiff underwent an MRI of the lumbosacral spine. (See id. at 216.) According to Dr. Richard Pinto ("Dr. Pinto"), the MRI revealed a right foraminal disc herniation at L2-L3, a developmental narrowing of the spinal canal of mild degree from L2-L5,

2

diffuse annular bulges at L2-L3, L3-L4, L4-L5, a small subligamentous disc protrusion at L3-L4, and a small annular bulge at L5-S1. (Id.)

During a follow-up visit on April 15, 2008, Dr. Babus concurred with the impressions of Dr. Pinto, and he noted that Plaintiff underwent an EMG that revealed no nerve damage. (See id. at 184.) Upon physical examination, Dr. Babus indicated that Plaintiff experienced mild decreased range of motion with pain and had difficulty completing the straight leg raising test, though Plaintiff was not straight leg positive. (Id.) Dr. Babus developed a treatment plan which included a diagnostic sleeve root injection at the right L2-L3. (Id.) Dr. Babus noted the potential for a future series of transforaminal epidural steroid injections, depending upon the results of the diagnostic sleeve root injections. (Id.)

Plaintiff received the diagnostic sleeve root injection at the right L2-L3 on April 23, 2008. (See id. at 178-80.) On May 5, 2008, Plaintiff reported experiencing 50-75% relief from the sleeve root injection. (Id. at 173.) As a result, Dr. Babus recommended an epidural steroid injection, consisting of bupivacaine and triamcinolone acetonide. (See id. at 173.) On May 8, 2008, Plaintiff received the epidural steroid injection at L2-L3 and L3-L4. (See id. at 171.) The purpose of this injection was to decrease pain and inflammation in the affected areas. (Id. at 174.) At a follow-up visit on June 3, 2008, Plaintiff stated that "he did not feel that he got much relief from his first epidural steroid injection." (Id. at 169.) Marissa Maurino, PA-C, therefore recommended Plaintiff for two more epidural steroid injections (id.), which were performed on June 10, 2008 (id. at 165), and July 15, 2008 (id. at 160). At another follow-up visit on August 13, 2008, Plaintiff reported experiencing a "very, very little bit of relief" that was "short-lived." (Id. at 158.) He felt that the injections "did not do much" for his groin pain. (Id.)

3

On August 25, 2008, Plaintiff received an epidural steroid injection to the sacroiliac joint ("SI") due to the lack of pain relief from the previous injections. (See id. at 157-58.) At a follow-up examination on September 11, 2008, Plaintiff reported "no relief whatsoever" from the SI injection. (Id. at 153.) Dr. Babus then prescribed Plaintiff the drug Lyrica. (Id. at 154.) At a visit on October 9, 2008, Plaintiff reported no relief from the Lyrica and requested OxyContin, which Dr. Babus denied because of Plaintiff's past substance abuse and methadone treatment. (Id. at 153.) Dr. Babus instead prescribed the non-narcotic drug Neurontin. (Id.) On January 29, 2009, Plaintiff reported to Dr. Babus that he was receiving OxyContin from his primary care physician. (Id. at 152.) Dr. Babus planned to follow up with patient on an as-needed basis. (Id.)

Between May 27, 2008, and July 29, 2008, Plaintiff attended physical therapy sessions approximately once a week, for a total of fourteen sessions. (See id. at 196-210.) At a physical therapy evaluation on June 5, 2008, Chintan Macwan, a physical therapist, indicated that Plaintiff had no groin pain, but still had lower back pain that ranged from four to seven on a scale of one to ten. (Id. at 205.) Chintan Macwan reported that Plaintiff had made gains through physical therapy—as evidenced by the decrease in pain—and would further benefit from electric stimulation, ultrasound, therapeutic massage, and muscle strengthening. (See id. at 206.) At another physical therapy evaluation on July 10, 2008, Plaintiff indicated that his groin pain had returned and his overall pain had worsened, now ranging between six and eight out of ten. (See id. at 200.)

On July 21, 2009, Plaintiff was examined by Dr. Anthony Alastra ("Dr. Alastra"), a neurosurgeon. (Id. at 148.) Dr. Alastra noted that Plaintiff's injuries were caused while lifting an object several years before the visit. (Id.) Because the previous pain treatments were

unsuccessful, Dr. Alastra recommended surgical intervention. (Id.) Plaintiff stated that he was interested in surgery. (See id.) However, because Plaintiff's most recent tests were over a year old, Dr. Alastra advised that an updated MRI and X-ray be taken. (Id. at 149.) An X-ray of the lumbar spine was taken on July 24, 2009 (id. at 214), and an MRI of the lumbosacral spine was performed on July 29, 2009 (id. at 212). Dr. Robert Solomon ("Dr. Solomon") reviewed the X-ray, noting impressions for multilevel degenerative and osteoarthritic changes. (Id. at 214.) Dr. Ajax George ("Dr. George") reviewed the MRI, and found a developmentally narrow spine canal, multilevel spondylosis, multiple disc herniations, and bulging discs at multiple levels. (Id. at 212.) Dr. George noted that the conditions were stable and consistent with the previous images. (See id.)

On August 25, 2009, Dr. Alastra reviewed Plaintiff's updated X-ray and MRI. (See id. at 147.) Dr. Alastra concurred with the impressions of Dr. Solomon and Dr. George, and he recommended that Plaintiff proceed with a discogram for purposes of surgical planning. (Id.) Dr. Babus performed the discogram on February 23, 2010, noting several disc bulges, tears, and degenerations, with L3-L4 concordant right groin pain at a usual pain level of eight out of ten. (Id. at 235.)

At a neurosurgical follow-up visit on March 11, 2010, Dr. Alastra noted that the most recent MRI suggested very mild lumbar degenerative disease most impressive at L4-L5, a component of central stenosis, and neurofaraminal narrowing at L3-L4. (Id. at 143.) Dr. Alastra also reviewed the most recent EMG, which was negative, and the aforementioned discogram. (Id.) Based on his review of the tests, Dr. Alastra believed that a minimally invasive fusion surgery was not necessary. (Id.) Instead, Dr. Alastra recommended that Plaintiff undergo a right L3-L4 hemilaminectomy and decompression surgery to treat the main component of his pain.

(Id.) Plaintiff indicated that he wanted the surgery and would notify Dr. Alastra when he was ready to schedule the appointment. (Id.) There is no indication in the Record that Plaintiff underwent the hemilaminectomy and decompression surgery.

On March 15, 2010, Dr. Alastra completed a Treating Physician's Wellness Report. (See id. at 240-41.) Dr. Alastra indicated diagnoses of chronic lower back pain with radiculopathy and a history of herniated discs at L1, L2, and L3. (Id. at 240.) Dr. Alastra further stated that the diagnosis and conditions had not yet been resolved, and, as a result, he considered Plaintiff to be temporarily unemployable. (Id. at 241.) Dr. Alastra did not specify an expected timeframe for Plaintiff's temporary inability to work. (Id.)

### 2. Dr. Daniel Feldman

On May 12, 2010, Dr. Daniel Feldman ("Dr. Feldman") completed a Treating Physician's Wellness Report. (See id. at 242-43.) Dr. Feldman indicated that Plaintiff was positive for pain in the lumbar spine upon a range of motion test, and for a straight leg raising test. (Id. at 242.) Dr. Feldman also noted diffuse tenderness to palpitations of the lumbar spine. (Id.) He further concurred with the findings of Dr. Alastra based on the recent MRI, which revealed multiple disc bulges, and the discogram, which showed concordant pain at L3-L4. (See id.) Dr. Feldman declared that plan to have Plaintiff undergo decompressive surgery of the lumbar spine. (Id.) He further indicated that Plaintiff would be temporarily unemployable until the surgery was performed and Plaintiff recovered. (Id. at 243.) Dr. Feldman estimated that it would take six to eight months to resolve Plaintiff's condition. (Id.) Dr. Feldman's conclusions were based on his examination of Plaintiff and a review of Plaintiff's medical record and reports from specialists. (Id.)

### 3.    Dr. Chitoor Govindaraj

On August 24, 2010, Dr. Chitoor Govindaraj ("Dr. Govindaraj") evaluated Plaintiff on behalf of the SSA. (See id. at 273-76.) Dr. Govindaraj noted Plaintiff's past medical history of psychiatric disorder, a problem with the disc in his lower back, arthritis, right meniscus tear, deformed right hand, and tendinitis. (Id. at 273.) At the time of the examination, Plaintiff that indicated he was seeing his primary care physician, Dr. Mikhail Paikin, on a monthly basis. (Id.) Plaintiff's medications included Lipitor, Percocet, and vitamins. (Id.) Dr. Govindaraj completed a physical examination of Plaintiff and, with regard to the spine, found no kyphoscoliosis, gibbus, or tenderness. (Id. at 275.) Plaintiff had a spinal range of motion within normal limits and was able to bend down and touch the floor. (Id.) Dr. Govindaraj found normal range of motion in the back and joints. (Id.) Plaintiff's straight leg raising test was negative. (Id.) Dr. Govindaraj diagnosed Plaintiff with history of lower back disorder, history of carpal tunnel syndrome, history of anxiety, history of bipolar disorder, history of incarceration, history of right knee meniscus pathology, and degenerative joint disease. (Id.) Dr. Govindaraj further stated that Plaintiff was medically stable and cleared for occupation. (Id.)

### 4.    Staten Island University Hospital

On March 27, 2009, Plaintiff underwent an initial psychiatric consultation at Staten Island University Hospital ("SIUH"). (See id. at 245.) Plaintiff reported suffering from visual and auditory hallucinations, but he denied any suicidal or homicidal thoughts. (Id.) On April 10, 2009, Herm Bluestone, a licensed clinical social worker ("LCSW Bluestone"), and Dr. Roberto Paranal ("Dr. Paranal") completed a more thorough psychiatric assessment of Plaintiff. (Id. at 246.) Dr. Paranal diagnosed Plaintiff with Psychiatric Disorder, not overly specific ("NOS"). (Id. at 256.) The initial treatment plan was to alleviate Plaintiff's psychotic symptoms

7

through psychotherapy. (Id. at 263.) Between April 29, 2009, and June 16, 2010, Plaintiff met with LCSW Bluestone a total of eight times. (Id. at 266-68.) Plaintiff regularly failed to meet the wellness and support goals of his treatment plan. (Id.) On June 16, 2010, Plaintiff reported no psychotic symptoms and an improved ability to cope with stress at home. (Id. at 268.)

On June 15, 2010, Dr. Paranal and LCSW Bluestone wrote a letter to the New York State Office of Temporary Disability Assistance explaining that Plaintiff was a patient at the SIUH Clinic for drug prescriptions and psychotherapy. (See id. at 244.) They reported that Plaintiff was unable to work at that time due to the severity of his symptoms. (Id.)

5.    Dr. Richard King

On August 13, 2010, Dr. Richard King ("Dr. King") completed a consultative psychiatric evaluation of Plaintiff on behalf of the SSA. (See id. at 270.) Plaintiff reported no history of psychiatric hospitalizations and indicated his current medications were Xanax, Risperdal, Suboxone, and Percocet. (Id. at 270-71.) Plaintiff stated that he had been anxious and depressed for many years, and that his back pain exacerbated his depression. (Id. at 270.) He admitted to heroin and cocaine dependence since the age of fourteen. (Id. at 271.) Plaintiff recalled being in the mental observation unit in prison, after overdosing in jail at the age of nineteen. (Id.) Plaintiff reported that he had been clean from drug use for seven years and that he was diagnosed with hepatitis C in 2002. (Id.) Plaintiff stated that he could perform routine activities of living, household chores, and shopping. (Id.) He was last employed in 2000, performing asbestos and lead paint removal. (Id.) Dr. King found Plaintiff to have adequate ability to concentrate. (Id.)

Dr. King conducted a mental status examination of Plaintiff and found that he was not in acute distress. (Id.) Plaintiff was cooperative, with coherent speech and had a friendly affect. (Id.) Dr. King noted that Plaintiff had no hallucinations or delusions, and was not significantly

8

anxious or depressed. (Id.) Dr. King found Plaintiff's intellectual functioning to be below the average level, as Plaintiff could not identify the president of the United States or the mayor of New York City, and he could recall only two out of three objects in five minutes. (Id.) Plaintiff had difficulty with spelling and could not adequately explain similarities between words or the meanings of proverbs. (See id.) Dr. King determined that Plaintiff's insight and judgment were fair and that he was oriented as to time, place, and person. (Id.)

Dr. King diagnosed Plaintiff with dysthymic disorder with anxiety in a mild to moderate degree, intravenous heroin and cocaine dependence, antisocial personality disorder, and illiteracy. (Id. at 271-72.) Dr. King suggested that Plaintiff could benefit from psychiatric treatment and from attending a substance abuse program. (Id. at 272.) Dr. King stated that, with treatment, Plaintiff's prognosis was fair. (Id.) Further, he opined that Plaintiff had a satisfactory ability to follow simple instructions, perform simple tasks, and a fair ability—with the recommended treatment—to follow complex instructions, perform complex tasks, and interact with coworkers in a work environment. (Id.)

6.    Dr. E. Charles

On September 30, 2010, Dr. E. Charles ("Dr. Charles"), a psychiatric consultant for the SSA, reviewed the evidence in Plaintiff's file and completed a Mental Residual Functional Capacity Assessment. (See id. at 280.) Dr. Charles opined that Plaintiff's understanding and memory were not significantly limited by his condition. (Id.) However, Dr. Charles determined that Plaintiff's attention span, ability to maintain a regular schedule with proper attendance, and ability to complete a normal workweek without psychological interruptions were all moderately limited. (Id. at 280-81.) Further, Plaintiff had a moderately limited ability to maintain socially appropriate behavior, respond to changes in the work setting, and independently set goals for

9

himself. (Id. at 281.) Dr. Charles stated that Plaintiff's limitations did not appear to impede his mental abilities for simple tasks. (Id. at 282.)

On October 21, 2010, Dr. Charles completed a Psychiatric Review Technique Form regarding the extent of Plaintiff's mental impairment. (Id. at 286.) Under Section 12.04 for Affective Disorders, Dr. Charles noted that Plaintiff had depressive syndrome, characterized by appetite disturbance, sleep disturbance, decreased energy, difficulty concentrating or thinking, and hallucination, delusions, or paranoid thinking. (Id. at 289.) Under Section 12.09 for Substance Addiction Disorders, Dr. Charles indicated that Plaintiff suffered from behavioral or physical changes associated with the regular use of substances that affect the central nervous system. (Id. at 294.) Dr. Charles opined that Plaintiff's mental impairments had a mild restriction on daily activities, social functioning, and maintaining concentration, and, therefore, did not satisfy the degree of marked or extreme limitation required to meet the "Paragraph B" criteria for applicants found to be disabled. (See id. at 296.) Dr. Charles also determined that because Plaintiff had only one or two extended episodes of deterioration, he did not meet the required degree of limitation for the functional criteria. (Id.) Finally, Dr. Charles considered the "Paragraph C" criteria, which, if satisfied, would support the opinion that an applicant is disabled, but he indicated that the evidence did not establish the presence of the "Paragraph C" criteria. (Id. at 297.)

**B.    Medical Evidence Submitted to the Appeals Council**

1.    Dr. Isaac Kreizman

Between December 9, 2011, and April 3, 2013, Dr. Isaac Kreizman ("Dr. Kreizman"), a pain management and rehabilitation specialist, examined Plaintiff approximately once per month for a total of eighteen visits. (Id. at 320-416.) At the initial examination on December 9, 2011,

Plaintiff complained of neck pain, mid back pain, low back pain, and gait disorder. (Id. at 364.) Plaintiff was experiencing a pain level of eight out of ten. (Id. at 363.) Dr. Kreizman indicated that Plaintiff was positive for paraspinal tenderness, decreased range of motion, and SI joint tenderness. (Id. at 365.) Dr. Kreizman diagnosed Plaintiff with lumbar radiculopathy, low back pain, and gait disorder. (Id. at 366.) The treatment plan included physical therapy. (Id.) Subsequent visits revealed no significant changes in Plaintiff's pain, despite continued treatment including pain medications MS Contin and Roxicodone. (See generally id. at 320-62, 370-416.).

### 2. Staten Island University Hospital

Between April 29, 2009, and May 23, 2013, Dr. Paranal examined Plaintiff approximately once per month. (See id. at 445-72.) Dr. Paranal prescribed Risperdal and Alprazolam to control Plaintiff's psychotic symptoms. (See id. at 437-44.) At all visits through January 26, 2011, Plaintiff reported that he was asymptomatic and doing well, and that he was advised to continue taking his prescribed medication. (See id. at 459-66.) On March 3, 2011, Plaintiff explained that he attempted to reduce his Risperdal intake and began having auditory hallucinations. (Id. at 458.) By the next visit, on March 29, 2011, Dr. Paranal noted that Plaintiff had returned to being asymptomatic. (Id. at 457.) Plaintiff continued his consultations with Dr. Paranal through May 23, 2013, and he repeatedly reported that he was doing well on the medication and had no significant changes in treatment. (See id. at 444-55.) On May 9, 2013, Dr. Paranal completed a Psychiatric/Psychological Impairment Questionnaire. (Psychiatric/Psychological Impairment Questionnaire (Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl.'s Mem.") (Dkt. 24), Ex. A) (Dkt. 24-1).) The SSA Appeals Council acknowledged receipt of the questionnaire. (R. at 2.)

## C.     Other Evidence

### 1.     Plaintiff's Testimony

During his March 27, 2012, hearing before Administrative Law Judge Hilton R. Miller (the "ALJ"), Plaintiff testified that he had not worked since 1991, when he was helping his uncle with deliveries in Puerto Rico. (Id. at 34.) Plaintiff stated that he had been looking for work since 2005, including taking an electrician's training course, but that he was unsuccessful in his job search. (Id.) Plaintiff testified that he was unable to work due to two herniated discs in his back and psychiatric medication that his doctors had prescribed. (Id. at 35.) Plaintiff also testified that he had been arrested three or four times, and was incarcerated on two occasions for possession of heroin, serving a total of four and a half years. (Id. at 37.) Plaintiff claimed not to have used heroin since 2005. (Id.) He testified that he could not use his right hand, and, as a result, had adapted to using his left hand for all activities. (Id. at 38.)

In a Function Report dated July 12, 2010, Plaintiff reported that his wife[1] prepares all of his meals. (Id. at 111.) Plaintiff also reported that his wife did all of the shopping and banking, and that he could not go outside alone anymore due to the medications he took for his psychotic disorder. (Id. at 112-13.) He testified that he tried to help care for his daughter and to help with household chores, but that he was routinely limited by his pain. (Id. at 110.) In reporting his hobbies and interests, Plaintiff listed only reading and watching television. (Id. at 113.) Due to his back pain and deformed right hand, Plaintiff reported that he was unable to lift, stand, walk, sit, climb stairs, kneel, squat, reach, or use his hands. (Id. at 114.) Plaintiff used a cane and wore a back brace, both of which were prescribed by doctors, whenever he was not in bed. (Id. at 115.) He was incapable of walking more than two blocks without taking a rest and had difficulty with his memory and attention span. (Id. at 115-16.) Plaintiff stated that his back pain

---

[1] Although Plaintiff refers to Kimberly Rivera as his wife, he has stated that they are not legally married. (R. at 84.)

began in 2004 but did not affect his activities until July 2007. (Id. at 117.) He claimed to be in pain all of the time, with the pain brought on by walking, standing, sitting, climbing stairs, and kneeling. (Id. at 118.) Plaintiff stated that the Percocet he took offered "not too much relief" and resulted in dizziness and sleepiness. (Id.)

2.  Vocational Expert Raymond Cestar's Testimony

Vocational expert Raymond Cestar ("Mr. Cestar") also testified at the March 27, 2012, hearing. (Id. at 35-39.) The ALJ asked Mr. Cestar to consider a hypothetical person with Plaintiff's age, education, work experience, and the residual functional capacity to lift and/or carry twenty pounds occasionally, ten pounds frequently, stand and/or walk with normal breaks for approximately six hours of an eight-hour workday, and sit with normal breaks for approximately six hours of an eight-hour workday. (Id. at 38.) In addition, the hypothetical person could not perform gross or fine manipulations with the right hand or use ladders, ropes, or scaffolds. (Id.) Mr. Cestar testified that such a person would have the capacity to perform the necessary tasks of a school bus monitor, school crossing guard, surveillance system monitor, and usher. (Id. at 38-39.)

## II.  PROCEDURAL HISTORY

On June 17, 2010, Plaintiff filed an application with the Social Security Administration to receive Supplemental Security Income benefits. (See id. at 84-89.) On October 22, 2010, the SSA denied Plaintiff's application. (See id. at 47-51.) On December 29, 2010, Plaintiff requested a hearing before an ALJ. (See id. at 53-55.) The ALJ held a hearing on March 27, 2012, at which Plaintiff represented himself pro se. (See id. at 28-40.) On April 19, 2012, the ALJ denied Plaintiff SSI benefits. (See id. at 12-24.) On June 22, 2012,

Plaintiff requested that the Appeals Council review the ALJ's decision. (See id. at 8-11.) On April 10, 2014, the Appeals Council denied Plaintiff's request for review. (See id. at 1-7.)

On May 15, 2014, Plaintiff filed the present action seeking judicial review of the SSA's denial of benefits pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (See Compl. (Dkt. 1).) The Commissioner filed her Answer, along with a copy of the Administrative Record, on September 18, 2014. (See Answer (Dkt. 7); R.) Plaintiff and the Commissioner have filed cross-motions for judgment on the pleadings pursuant to Federal Rules of Civil Procedure 12(c). (See Pl.'s Mem.; Mem. of Law in Supp. of Def.'s Cross-Mot. for J. on the Pleadings & in Opp'n to Pl.'s Mot. for J. on the Pleadings ("Def.'s Mem.") (Dkt. 26).)

## III.  LEGAL STANDARD

### A.  Review of Final Determinations of the Social Security Administration

Under Federal Rule of Civil Procedure 12(c), "a movant is entitled to judgment on the pleadings only if the movant establishes 'that no material issue of fact remains to be resolved that [he] is entitled to judgment as a matter of law.'" Guzman v. Astrue, No. 09-CV-3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting Juster Assocs. v. City of Rutland, 901 F.2d 266, 269 (2d Cir. 1990)). "The role of a district court in reviewing the Commissioner's final decision is limited." Pogozelski v. Barnhart, No. 03-CV-2914 (JG), 2004 WL 1146059, at *9 (E.D.N.Y. May 19, 2004). "[I]t is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "Substantial evidence means more than a mere scintilla. It means such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 1990) (internal quotation marks omitted). Thus, as long as (1) the ALJ has applied the correct legal standard, and (2) the ALJ's findings are supported by evidence that a reasonable mind would accept as adequate, the ALJ's decision is binding on this court. See Pogozelski, 2004 WL 1146059, at *9.

## B. Determination of Disability

"To receive federal disability benefits, an applicant must be 'disabled' within the meaning of the Social Security Act." Shaw, 221 F.3d at 131; see also 42 U.S.C. § 423. A claimant is "disabled" within the meaning of the Act if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The impairment must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

The SSA has promulgated a five-step procedure for determining whether a claimant is "disabled" under the Social Security Act. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). In Dixon v. Shalala, 54 F.3d 1019 (2d Cir. 1995), the Second Circuit described this five-step analysis as follows:

> The first step in the sequential process is a decision whether the claimant is engaged in "substantial gainful activity." If so, benefits are denied.
>
> If not, the second step is a decision whether the claimant's medical condition or impairment is "severe." If not, benefits are denied.

15

If the impairment is "severe," the third step is a decision whether the claimant's impairments meet or equal the "Listing of Impairments" set forth in . . . the social security regulations. These are impairments acknowledged by the Secretary to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the "listed" impairments, he or she is conclusively presumed to be disabled and entitled to benefits.

If the claimant's impairments do not satisfy the "Listing of Impairments," the fourth step is assessment of the individual's "residual functional capacity," i.e., his capacity to engage in basic work activities, and a decision whether the claimant's residual functional capacity permits him to engage in his prior work. If the residual functional capacity is consistent with prior employment, benefits are denied.

If not, the fifth and final step is a decision whether a claimant, in light of his residual functional capacity, age, education, and work experience, has the capacity to perform "alternative occupations available in the national economy." If not, benefits are awarded.

Id. at 1022 (citations omitted).

The "burden is on the claimant to prove that he is disabled." Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998) (citation and internal quotation marks omitted). However, if the claimant shows at step four that his impairment renders him unable to perform his past work, there is a limited shift in the burden of proof at step five that requires the Commissioner to "show there is other gainful work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

In making the determinations required by the Social Security Act and the regulations promulgated thereunder, "the Commissioner must consider (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's educational background, age, and work experience." Pogozelski, 2004 WL 1146059, at *10 (citing Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)).

Moreover, "the ALJ conducting the administrative hearing has an affirmative duty to investigate facts and develop the record where necessary to adequately assess the basis for granting or denying benefits." Id.

### C.    Treating Physician Rule

Under the SSA's regulations, "a treating physician's report is generally given more weight than other reports." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). A "treating physician" is a physician "who has provided the [claimant] with medical treatment or evaluation, and who has or who had an ongoing treatment and physician-patient relationship with the individual." Sokol v. Astrue, No. 04-CV-6631 (KMK) (LMS), 2008 WL 4899545, at *12 (S.D.N.Y. Nov. 12, 2008). The SSA's "treating physician rule" requires an ALJ to give a treating physician's opinion "controlling weight" if "the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c). On the other hand, "[w]hen other substantial evidence in the record"—such as other medical opinions—"conflicts with the treating physician's opinion, that opinion will not be deemed controlling." Snell, 177 F.3d at 133. In addition, "some kinds of findings—including the ultimate finding of whether a claimant is disabled and cannot work—are reserved to the Commissioner" and, therefore, are not given controlling weight. Id. (internal quotation marks omitted.)

Even where an ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must assess several factors to determine how much weight to give the opinion. See 20 C.F.R. § 404.1527(c)(2). Specifically, the ALJ must assess: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the

opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998); see also 20 C.F.R. § 404.1527(c)(2)-(6). While an ALJ need not mechanically recite each of these factors, he or she must "appl[y] the substance of the treating physician rule." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). The court will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion," or when the court "encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Id. at 33.

## IV. DISCUSSION

Plaintiff argues that the ALJ erred in concluding that he was not disabled under the Social Security Act. (Pl.'s Mem. at 9.) Plaintiff does not dispute the ALJ's findings at the first three steps of the five-step analysis, namely that: (1) Plaintiff has not engaged in substantial gainful activity since June 2, 2010, the application date; (2) Plaintiff has severe impairments including lower back disorder, deformed right hand, dysthymic disorder, and intravenous heroin and cocaine dependence in remission; and (3) Plaintiff does not have an impairment or combination of impairments that meets any of the SSA's Listing of Impairments. (R. at 17.)

However, Plaintiff does dispute the ALJ's findings at the fourth step of the analysis that Plaintiff had the residual functional capacity ("RFC") to "perform light work as defined in 20 C.F.R. 416.967(b),"[2] except that Plaintiff cannot climb ropes, ladders, or scaffolds, cannot do any gross or fine manipulation of objects with his right hand, and is limited to work involving simple, routine, and repetitive tasks. (Id. at 19.) Plaintiff argues that four errors were made in

---

[2] Light work is defined as being capable of "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b).

the determination of Plaintiff's RFC, which the ALJ partially relied upon in finding at the fifth step of the analysis that Plaintiff could perform jobs that existed in significant numbers in the national economy. (Id. at 22.) Plaintiff asserts that: (1) the ALJ improperly weighed the medical evidence; (2) the ALJ failed to adequately develop the medical record; (3) the Appeals Council incorrectly denied the consideration of new evidence; and (4) the ALJ erred in his evaluation of Plaintiff's credibility. (See Pl.'s Mem. at 9-16.) The court finds that while the ALJ adequately developed the Record, he did not properly weigh all of the medical evidence. The court declines at this stage to address whether the ALJ erred in evaluating Plaintiff's credibility. The court also finds that the Appeals Council erred in failing to consider new evidence submitted after the ALJ's decision.

### A.    Whether the ALJ Properly Weighed the Evidence

Plaintiff contends that the ALJ improperly weighed the medical evidence in concluding that he was not disabled. (See id. at 9-15.) Plaintiff argues that the ALJ did not afford sufficient weight to the opinions of his treating physicians, Dr. Paranal, Dr. Alastra, and Dr. Feldman (the "Treating Physicians"). Specifically, Plaintiff claims that the ALJ "simply ignore[d] these opinions." (Id.) The court agrees.

The ALJ erred in failing to address the Treating Physicians' opinions in his decision. The ALJ is required to evaluate every medical opinion in the record, regardless of its source, but of particular importance are those of a claimant's treating physicians. See 20 C.F.R. § 416.927(c); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993) (holding that SSA regulations specifically require the ALJ to evaluate the opinions of treating physicians); Caserto v. Barnhart, 309 F. Supp. 2d 435, 445 (E.D.N.Y. 2004) (stating that ALJ erred by failing to acknowledge treating physicians' opinions); Providence v. Barnhart, No. 02-CV-9208 (SHS), 2003 WL 22077445, at

*8 (S.D.N.Y. Sept. 5, 2003) (same). Here, the ALJ briefly explained some of the medical evidence submitted by the Treating Physicians, but he did not address all of their opinions. (See R. at 20-21.) For example, the ALJ did not mention the Treating Physician's Wellness Plan Report dated March 15, 2010, in which Dr. Alastra opined that Plaintiff's condition had not been resolved or stabilized, and that he therefore was "temporarily unemployable." (Id. at 241.) Dr. Alastra also indicated that surgical treatment may be necessary. (Id.) The ALJ similarly did not consider Dr. Feldman's Treating Physician's Wellness Plan Report dated May 12, 2010, in which Dr. Feldman explained that Plaintiff was "[temporarily] unemployable until the decompressive surgery is performed and [patient] recovered." (Id. at 243.) The ALJ likewise was silent as to Dr. Paranal's June 15, 2010, letter, in which Dr. Paranal opined that Plaintiff "is unable to work at this time due to the severity of his symptoms." (Id. at 244.) The ALJ's failure to address the Treating Physicians' opinions constitutes legal error.

Even if the court assumes that the ALJ did not address the Treating Physicians' opinions because he believed they deserved no weight, he erred in failing to explain the basis for this conclusion. The ALJ is required to provide good reasons for the decision not to afford controlling weight to a treating source's opinion. See Burgess v. Astrue, 537 F.3d 117, 132 (2d Cir. 2008) (holding that a plaintiff is entitled to a comprehensive statement by the ALJ regarding what weights were given to medical opinions); Halloran, 362 F.3d at 33 (noting that a court will "not hesitate to remand" when the ALJ does not comprehensively set forth reasons for the weight assigned to a treating physician's opinion); Schaal, 134 F.3d at 505 (stating that failure to provide "good reasons" for apparently affording no weight to treating physician's opinion constitutes legal error); see also 20 C.F.R. § 416.927. The ALJ must consider several factors in the determination of the proper weight afforded to a treating physician's opinion,

including the length of the treatment relationship, supportability of the findings, and the specialization of the treating physician. See 20 C.F.R. § 494.1527(c)(2)-(6). Although the ALJ need not mechanically recite each of these factors, he must still "set forth reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 32 (2d Cir. 2004). But see Seilan v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) (holding that an ALJ must explicitly consider the factors outlined in the SSA regulations when determining what weight to afford a treating physician). This requirement exists to assist a claimant in understanding the disposition of his or her case, and it is especially important when the disposition is unfavorable for the claimant, as is the case here. See Snell, 177 F.3d at 134. Because the ALJ did not mention the Treating Physicians' opinions in his decision, he neither discussed—explicitly or implicitly—any of the factors he must assess to weigh these opinions, nor articulated any reason—much less good reasons—for a decision to afford them no weight. Accordingly, the ALJ failed to satisfy his obligation to properly explain the weight given to the Treating Physicians' opinions.[3]

### B.  Whether the ALJ Properly Developed the Record

Plaintiff also argues that the ALJ failed to adequately develop the Record regarding the medical evidence and opinions of the Treating Physicians. (Pl.'s Mem. at 11-12.) The court disagrees.

In a Social Security disability hearing, the ALJ is required to "affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Lamay v.

---

[3] Plaintiff also argues that the ALJ afforded too much weight to the opinions of Dr. Govindaraj, Dr. King, and Dr. Charles because they were contradicted by the Treating Physicians' opinions. (Pl.'s Mem. at 13-14.) When a consulting physician's opinion is given more weight than a treating source's opinion, the ALJ must provide a comprehensive explanation for the decision. See Hernandez v. Astrue, 814 F. Supp. 2d 168, 187-88 (E.D.N.Y. 2011) (holding that if an ALJ relies "almost exclusively on the opinions of the consultative physician[s]," then the ALJ must provide good reasons for not giving weight to treating physicians); see also 20 C.F.R. § 416.927(e)(2)(ii). Here, however, because the ALJ did not properly consider the Treating Physicians' opinions, and Plaintiff's argument is dependent upon a comparison between the opinions of the Treating Physicians and the consulting examiners, it is premature to decide whether the opinions of the consulting physicians were afforded too much weight. On remand, the ALJ shall properly evaluate and weigh all available medical opinions.

Comm'r of Soc. Sec., 562 F.3d 503, 509 (2d Cir. 2009) (quoting Tejada v. Apfel, 167

F.3d 770, 774 (2d Cir. 1999)). "When a claimant properly waives his right to counsel and

proceeds pro se, the ALJ's duties are heightened." Moran v. Astrue, 569 F.3d 108, 113

(2d Cir. 2009) (internal quotation marks omitted). "Where there are gaps in the administrative

record, remand to the Commissioner for further development of the evidence is in order."

Sobolewski v. Apfel, 985 F. Supp. 300, 314 (E.D.N.Y. 1997). Here, while the court agrees that

the ALJ had a heightened duty to develop the Record because Plaintiff appeared pro se at the

benefits hearing, Plaintiff does not point to—and the court cannot find—any gaps in the Record.

The Record contains medical evidence from Healthcare Associates in Medicine, P.C. regarding

Plaintiff's back pain, including physicians' notes and test results ranging from 2007 to 2010,

many of which were signed by Plaintiff's treating physician Dr. Alastra. (See R. at 143-241.)

The Record also contains evidence describing Plaintiff's mental health treatment at SIUH, from

his initial evaluation until the time he filed for disability. (See id. at 245-68.) The evidence from

SIUH also includes treating physician Dr. Paranal's progress notes from each visit. (See id.

at 470-72.)

     Plaintiff alternatively argues that the ALJ failed to properly develop the Record because

he did not request supplemental reports from the Treating Physicians. (Pl.'s Mem. at 12.)

Plaintiff relies on Peed v. Sullivan, 778 F. Supp. 1241 (E.D.N.Y. 1991), where the court held that

the ALJ cannot solely rely on charts and lab tests from treating physicians, but rather, "[i]t is the

opinion of the treating physician that is to be sought." Id. at 1246. The record in Peed did not

contain "any ultimate diagnosis by any . . . treating physicians as to Mr. Peed's disability status."

Id. at 1243. However, in this case, the Record before the ALJ included the opinions of the

Treating Physicians, each of whom stated that Plaintiff was not capable of employment. (See R.

at 240-44.)  Because the court can find no gaps in the Record, and because the Record contains the opinions of Plaintiff's Treating Physicians, the court finds that the ALJ met his duty to compile a complete record.

## C.    Whether the Appeals Council Properly Denied Consideration of New Evidence

Plaintiff next argues that remand is necessary to require the SSA to consider a Psychiatric/Psychological Impairment Questionnaire ("the Questionnaire") first submitted to the Appeals Council.  (Pl.'s Mem. at 15-16.)  The court agrees.

"[I]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."  20 C.F.R. § 416.1470(b); see also Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996); Shrack v. Astrue, 608 F. Supp. 2d 297, 302 (D. Conn. 2009).  For evidence to be considered "new," the court must find that the evidence is not "merely cumulative of what is already in the record."  Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988) (citation omitted). Evidence is "material" if it is both "relevant to the claimant's condition during the time period for which benefits were denied," and "probative."  Pollard v. Halter, 377 F.3d 183, 193 (2d Cir. 2004) (quoting Tirado, 842 F.2d at 597).  For evidence to be considered probative there must be "a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently."  Id.  When new evidence is submitted to the Appeals Council following the ALJ's decision, the evidence "becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision."  Perez, 77 F.3d at 45.  If the Appeals Council fails to consider new and material evidence, "the proper course for the reviewing court is to remand the case for reconsideration in light of the new evidence."  Shrack, 608 F. Supp. 2d at 302; see also Canales v. Comm'r of Soc.

23

Sec., 698 F. Supp. 2d 335, 342 (E.D.N.Y. 2010) (remanding because Appeals Council failed to consider treating psychiatrist's report).

The Questionnaire in this case, completed by Plaintiff's treating physician Dr. Paranal, is one of the most detailed opinions from a treating physician in the Record. (See Pl.'s Mem., Ex. A.) It explained the extent to which Plaintiff's daily functions were limited by his symptoms, and the frequency that his symptoms could be expected to interfere with his employment. (See id.) Because much of the information contained in the Questionnaire is not present elsewhere in the Record, the Questionnaire is "new" evidence. In addition, because Dr. Paranal indicated that Plaintiff's symptoms and limitations began on April 10, 2009, over a year before Plaintiff applied for SSI, the Questionnaire is relevant to the period for which Plaintiff sought benefits. (See id.)

Furthermore, Dr. Paranal opined that Plaintiff's symptoms "markedly limited" some of his functions, including his ability to understand and remember detailed instructions, to carry out detailed instructions, to sustain an ordinary routine without supervision, to complete a normal workweek, and to respond to changes in a work setting. (Id.) This directly contradicts Dr. Charles's opinion—an opinion to which the ALJ afforded "great weight." (See R. at 22.) Dr. Charles noted that Plaintiff had no "marked" or "extreme" limitations due to his psychiatric symptoms. (See id. at 296.) Dr. Paranal also indicated in the Questionnaire that Plaintiff was "incapable of even low stress," and would be expected to be absent from work "more than three times a month" due to his symptoms; this is information that contradicts the ALJ's finding that Plaintiff had the residual functional capacity to perform light work. (See Pl.'s Mem., Ex. A.) Because the Questionnaire contains information that conflicts with evidence in the Record and the ALJ's findings, there is a reasonable possibility that it would influence the SSA to decide

Plaintiff's application differently. Accordingly, the Commissioner should consider Dr. Paranal's Questionnaire on remand.

### D.    Whether the ALJ Properly Evaluated Plaintiff's Credibility

Plaintiff further argues that the ALJ inappropriately assessed his testimony concerning the severity and limitations of his pain and symptoms. (Pl.'s Mem. at 16-19.) When medical evidence conflicts with a claimant's subjective statements about his or her condition, the ALJ has a duty to make findings of credibility. See Snell, 177 F.3d at 135. The credibility of a claimant's statements are evaluated based on their consistency with the objective medical evidence. See 20 C.F.R. § 416.929(a). Here, the ALJ found that while the medically determinable impairments Plaintiff suffered from "could reasonably be expected to cause the alleged symptoms," Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [] residual functional capacity assessment." (R. at 20.) However, the court need not decide at this stage whether the ALJ properly analyzed the credibility of Plaintiff's subjective testimony about his conditions. Because a credibility determination is dependent upon a proper assessment of the Record as a whole, the ALJ will, on remand, consider Plaintiff's subjective complaints in light of the revised evaluation of the medical evidence. See Rosa v. Callahan, 168 F.3d 72, 82 n.7 (2d Cir. 1999) (holding that the court cannot assess the ALJ's credibility determination because it was based upon an incorrect assessment of the medical evidence); see also Sutherland v. Barnhart, 322 F. Supp. 2d 282, 291 (E.D.N.Y. 2004).

### V.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is GRANTED, the Commissioner's cross-motion for judgment on the pleadings is DENIED, and

this case is REMANDED to the SSA for a proper evaluation of the medical opinions, consideration of the new evidence, and a revised evaluation of the credibility of Plaintiff's subjective complaints in light of all the medical evidence.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      August *10*, 2016

NICHOLAS G. GARAUFIS
United States District Judge